IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| EVA J. CABAÑAS-MALAVE, | |
| Plaintiff, | |
| v. | CIV. NO.: 08-1295(JAG/SCC) |
| JOHN MCHUGH, SEC'Y OF THE ARMY,[1] | |
| Defendant. | |

## REPORT AND RECOMMENDATION

In this employment discrimination suit by Plaintiff Eva J. Cabañas-Malave against the Defendant Secretary of the Army, we previously considered a motion for summary judgment

---

**1.** This suit was originally named as the defendant Pete Geren, who was the Secretary of the Army at the time the complaint was filed. The Secretary of the Army is now John McHugh, and though he has never filed a motion to substitute, he automatically substituted for Geren at the time of his appointment. *See* FED. R. CIV. P. 25(d) (providing that when a public officer resigns, his "successor is automatically substituted as a party").

filed by the Government. In our report and recommendation, we recommended that her Title VII discrimination claim be dismissed. *See* Docket No. 65, at 15. At the same time, we recommended that the presiding judge reject the Government's argument that Plaintiff had failed to exhaust administrative remedies with regard to her retaliation claim, which we concluded should survive. *See id.* at 16–17. Nonetheless, we were of the opinion that Plaintiff's hostile work environment and retaliation claims were unlikely to survive a properly presented motion for summary judgment, because her evidence as to those claims would likely mirror the fairly thin evidence she had presented to show pretext on her discrimination claim. *See id.* at 17. We thus recommended that the presiding district judge consider ordering the parties to brief the court on those claims. *Id.* at 18–19.

The presiding district judge adopted our report and recommendation and ordered the parties to brief the hostile work environment and retaliation claims "by way of summary judgment." Docket No. 66. Pursuant to that Order, the Government filed a second motion for summary judgment, which largely incorporates the facts recited in its first motion. *See* Docket No. 69. We now take up that motion, which has been

referred for a report and recommendation, and recommend that it be granted in part and denied in part.

### I.   Factual Background[2]

In May 1999, Plaintiff Eva J. Cabañas-Malave was hired as a civilian employee with the Department of the Army's Department of Morale, Welfare, and Recreation ("MWR"); she was employed as a librarian. Cabañas's position was identified by Bargaining Unit Status Code 6411. In April 2006, the Department of Defense began to implement what is known as the National Security Personnel System ("NSPS"). Under the guidance issued by the Department of Defense, certain non-bargaining unit employees (Status Codes 7777 and 8888) were to be converted from the GS system to the non-appropriated funding category. The guidance further stated that conversion should be based on an employee's position of record, not any

---

**2.**   The parties explicitly incorporate the statements and counterstatements of material fact that they appended to the previous motion for summary judgment, and with their new motions they only seek to add a limited number of new facts. Below, we therefore repeat, in full, the summary of the facts from our previous report and recommendation. In doing so, we omit any citations to the record or analysis of the parties' objections and arguments, all of which have already been ruled upon. Where we cite to the record and the parties' statements, then, we do so because we are incorporating new facts relevant only to the present motion.

position to which she has been temporarily promoted. Shortly after the implementation of the NSPS began, the Army instituted a nationwide hiring freeze. During the hiring freeze, however, regional directors could approve temporary promotions under certain circumstances.[3]

In March 2006, Cabañas's supervisor, John Tejera, retired as Supervisory Librarian, a GS-11 position; afterward, Plaintiff was the only librarian at Fort Buchanan. On Tejera's retirement, Mary Davison became Cabañas's direct supervisor. Davison requested from Freddie Giddens, Director of MWR, that Cabañas be temporarily promoted to Supervisory Librarian, but the request was denied. Subsequently, however, Giddens did request that Cabañas be detailed[4] to the Supervisory Librarian position, but this would come without increased

---

3.   The Army notes that the alleged discriminator, Freddie Giddens, was not a regional director and that, moreover, Army memoranda said that exceptions to the policy should be granted sparingly.

4.   A detail is a temporary assignment to a different position for a specified period of time, with the employee later returning to her original job; when detailed, an employee retains the status and pay of her official position. By contrast, a temporary promotion comes with a pay increase, and the employee receives time-in-grade credit; like details, temporary promotions are made with the intention that the employee eventually return to her lower-graded, permanent position.

pay.[5] Giddens told Cabañas that she would have to perform the supervisory duties regardless of whether or not she was paid for them, because she was the only librarian at the base. After her detail, Cabañas regularly emailed Giddens and Davison asking about the Supervisory Librarian position, but she never heard back.

In January 2007, Giddens filled out a performance evaluation form for Cabañas. In it, he gave her the highest ratings and she received a $2,500 performance bonus, the first such bonus she had received while working at Ft. Buchanan.[6] Docket No. 69-1, ¶ 2; Docket No 71, at 3. That same month, Giddens requested that Cabañas be promoted temporarily to the Supervisory Librarian position, with a pay raise. The tempo-

---

5.  This bit is hard to understand. The Army says—and Cabañas does not deny—that Giddens made the Request on August 18, 2006, asking for Cabañas to be detailed to the Supervisory Librarian position from March 24, 2006, until, at the latest, July 21, 2006. The request, which was apparently approved on September 19, 2006, was therefore retroactive, but neither party mentions or explains this fact.

6.  This same month, however, during a meeting between Cabañas, Davison, and Giddens, Giddens said to them, "you all need to put your S-H-I-T together because you come and see me and you are just a total, you two are, the whole division is all screwed up." Docket No. 69-1, ¶ 17; Docket No. 71, at 3.

rary promotion was not approved until August 5, 2007, and was not to exceed December 2, 2007. Giddens also approved the conversion of 11 employees into NSPS—seven females and four males. Cabañas's position was not converted because, although she was performing supervisory duties, she was not technically a supervisor. In July 2009, Cabañas was formally and finally promoted to the Supervisory Librarian position.[7] By this time, Giddens was no longer the Director of MWR.

The Army admits that Giddens was generally rude and unprofessional towards Cabañas and the other library employees. He was demeaning, and would address her as "Ms. Librarian" rather than by her name; he would not greet the employees when entering the library, and would instead tell them loudly to "come here"; and he would gesture with his hands rather than speak. However, this conduct was not addressed specifically at Cabañas so much as at the employees more generally, including non-Puerto Rican employees. Docket No. 69-1, ¶ 18; Docket No. 71, at 3.

---

**7.** Before this promotion, the Supervisory Librarian position was advertised twice; Cabañas did not apply either time. This was because she did not believe she should have to apply for the position, as she was already doing supervisory work. Docket No. 69-1, ¶ 3; Docket No. 71, at 3.

According to her amended complaint, Cabañas began complaining of alleged discrimination in January 2007, when she went to the Ft. Buchanan Investigator General's office. Docket No. 9, ¶ 18. That same month, she also complained to the Equal Employment Opportunity Office at Ft. Buchanan. *Id.* ¶ 19. After not hearing anything, she returned to the EEO Office on February 21, and she spoke with Cesar Vargas, who told her that she could not file a case with the EEO Office because she had already filed with the IG. *Id.* ¶ 20. She returned again in May 2007, and she spoke with Maria Clemente. Then, in August of that year, another EEO Officer, Hector Santiago, took papers to Cabañas in the library so that she could sign them; she asked to take the papers to her lawyer. *Id.* ¶ 24. Santiago, she alleges, refused to give her the papers, and instead he began screaming at her. Cabañas said during her deposition that Santiago screamed at her because he and the other EEO Officers wanted to minimize complaints to make themselves look good for the base commander; she also speculated that he yelled at her because he was tired of her filing complaints. Docket No. 69-1, ¶ 16; Docket No. 71, at 3.

For filing her complaints, Cabañas believes she was retaliated against when the Army withdrew certain entitlemen-

ts she had previously held, especially a transportation agreement. Cabañas first received such an agreement as a dependent of her ex-husband, who was transferred from Puerto Rico to Texas, and then to Hanau, Germany. Docket No. 69-1, ¶ 20; Docket No. 71, at 5. This agreement listed the family's home of residence as Bayamon, Puerto Rico. Docket No. 69-1, ¶ 20; Docket No. 71, at 5. In 1990, while she and her husband were living in Germany, they divorced. Docket No. 69-1, ¶ 20; Docket No. 71, at 6. After the divorce, she was hired as a civilian employee of the Army, and she remained in Germany until 1999, when she was ordered to report to Ft. Buchanan as a librarian. Docket No. 69-1, ¶ 20; Docket No. 71, at 7. At this time, she was given her own transportation agreement, which also listed her home on record as Bayamon. Docket No. 69-1, ¶ 20; Docket No. 71, at 7. The document signed by Cabañas indicates that it was a renewal, not initial, agreement. Docket No. 71-6, at 1.

Cabañas suggests that something went wrong when her travel agreement was signed in 1999.[8] She says that the portion

---

**8.** We pause here to note that a large number of Cabañas's proposed facts consist of nothing but legal argument, and several more contain a large amount of it. Of course, we ignore any non-factual material included

marking "renewal" was a clerical error, and that it should have been an initial agreement. Docket No. 71, ¶ 18. This is because when she moved in 1999 it was under her own orders, from official station to official station, and she got her own travel agreement related to her own employment. *Id.* As such, she says, her home of record should not have been Bayamon, it should have been Hanau, Germany. *Id.* ¶¶ 17, 19. She says she does not know why Bayamon is listed. *Id.* ¶ 17. She also claims to have been told, upon arriving at Ft. Buchanan, that her benefits could not be revoked except by death or retirement. *Id.* ¶ 18.

In April 2008, a year after Cabañas first complained about her alleged discrimination, her transportation agreement was revoked. Docket No. 69-1, ¶ 22; Docket No. 71-6, at 8. This happened around the time that she was renewing her military ID.[9] Docket No. 71, ¶ 15; Docket No. 77-1, ¶ 15. A human resources officer, Samuel McGuinness, met with her and explained the Army's justification for the revocation: that the

in the proposed facts.

**9.** Cabañas suggests that she was at all times an "Outside the Continental U.S." employee for the purposes of her position, but she cites nothing to support this contention and so we reject it. *See* Docket No. 71, ¶ 16.

Army had mistakenly extended her entitlements when she returned to Puerto Rico from Germany. Docket No. 69-1, ¶ 22; Docket No. 71-6, at 8. During that meeting, McGuinness made a remark that Cabañas interpreted as sexual harassment; namely, regarding the revocation of her commissary benefits,[10] he said, "if you need something from the Commissary, if you need not dogs, I will get them for you." Docket No. 69-1, ¶ 23; Docket No. 71-6, at 9. She also generally found his behavior to be belittling, insincere, and sarcastic. Docket No. 69-1, ¶ 23; Docket No. 71-6, at 9. That said, beyond the hot dog remark, McGuinness made no further comments disparaging either women or Puerto Ricans. Docket No. 69-1, ¶ 23; Docket No. 71-6, at 9.

Cabañas also believes she was retaliated against by Giddens and other supervisors. She recounts an incident on August 3, 2007, where Giddens held a very late staff meeting. Docket No.

---

**10.**  In our first report and recommendation we lamented the fact that the parties had not "made any real effort to give us background knowledge about" the relevant Army policies involved in this case. Docket No. 65, at 13 n.9. That problem is repeated in the second motion for summary judgment and its opposition, and we are left to assume that the revocation of the transportation agreement also acted as a revocation of her commissary benefits, but the parties don't explicitly say this—and in places, they contradict it, *see, e.g.,* Docket No. 71, ¶ 22.

9, ¶ 27. Afterward, Giddens sent James Welch, who was outside of Cabañas's chain of command,[11] to tell her that if she fidgeted during the next staff meeting, Giddens would punish everyone by keeping them in the meeting longer. Docket No. 71, ¶ 13; Docket No. 77-1, ¶ 13. Cabañas's formal EEO complaint was filed on August 17, 2017. Docket No. 71, ¶ 14; Docket No. 77-1, ¶ 14. Previously, she had spoken with several other EEO Officers, but they had not ever coordinated to work on her case. Docket No. 71, ¶ 14b; Docket No. 77-1, ¶ 14b. The second of these Officers, Vargas, told her that she could not file both an IG and EEO complaint at the same time, because both the IG and the EEO Officer worked for the same commander.[12] Docket No. 71, ¶ 14d; Docket No. 77-1, ¶ 14d. Nonetheless,

---

**11.**  Defendant purports to deny that James Welch was outside of Cabañas's chain of command, saying that he "does not have sufficient information as to form a belief as to" that fact. Docket No. 77-1, ¶ 13. Both Cabañas and Welch were employees of the Army. Defendant is the Secretary of the Army. It is hard to imagine that anyone is in a better position than Defendant to determine whether Welch was in Cabañas's chain of command. We therefore deem the proposed fact admitted.

**12.**  We reject Defendant's argument that this and other proposed facts contains impermissible hearsay. Each concern statements that Defendant's employees made to Cabañas; as such, the statements are not hearsay. *See* FED. R. EVID. 802(d)(2)(D).

during this meeting Cabañas signed a form indicating that she did not wish to file a complaint at that time. Docket No. 71, ¶ 14d; Docket No. 77-1, ¶ 14d. When Cabañas spoke with another EEO Officer, Santiago, he yelled at her when she refused to sign the complaint form without having her attorney review it first, telling Cabañas that her lawyer could not be involved until after the complaint had been filed. Docket No. 71, ¶ 14e; Docket No. 77-1, ¶ 14e. Moreover, Cabañas notes that her IG complaint never resulted in any report, nor has she ever been told what happened with her request for an investigation.[13] Docket No. 71, ¶ 13b; Docket No. 77-1, ¶ 13b.

## II.  Summary Judgment Standard

A motion for summary judgment will be granted "if the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is in genuine dispute if it could be resolved in favor of either party, and it is material

---

**13.** Defendant also purports to deny this fact based on a claim that it lacks "sufficient information to form a belief as to the matter asserted." Docket No. 77-1, ¶ 13b. But, again, we will not let the Army deny facts about its own activities based on a supposed lack of information. The fact is therefore deemed admitted.

if it potentially affects the outcome of the case. *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004).

The movant carries the burden of establishing that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden may be satisfied by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations . . . or other materials." FED. R. CIV. P. 56(c)(1)(A). The movant may also point to a lack of evidence supporting the nonmovant's case. *See* FED. R. CIV. P. 56(c)(1)(B); *see also Celotex*, 477 U.S. at 325. Once the movant makes a preliminary showing that no genuine issues of material fact exist, "the nonmovant must produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy [dispute]." *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) (internal quotation marks omitted); *see also* FED. R. CIV. P. 56(c)(1).

In evaluating a motion for summary judgment, we view the record in the light most favorable to the nonmovant. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

### III.    Analysis

Below, we separately consider Cabañas's two remaining claims, which are for hostile work environment and retaliation. We will begin with her hostile work environment claim because it is premised on much of the same facts as were her previously dismissed claims.

### A.  Hostile Work Environment

To make a *prima facie* case for a hostile work environment claim, Cabañas must show: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that this harassment *was based upon sex or race*; (4) that the harassment was of such severity that it altered the conditions of her employment and created an abusive work environment; (5) that the harassment was both subjectively and objectively offensive; and (6) that there is a basis for employer liability. *See O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001). Of course, Cabañas, as a Puerto Rican female, is a member of a protected class, but she struggles to satisfy the discrimination-related elements.

As Cabañas notes in her brief, we have already found that Giddens's conduct towards Cabañas and her co-workers was rude and unprofessional. *See* Docket No. 71-1, at 9. But at the

same time, we found that she had failed to come forward with any evidence that his actions, when directed at her, were "*because of* her membership in a protected group." Docket No. 65, at 15. As to her hostile work environment claim, the situation remains the same. We have some more examples of Giddens acting rudely, but they fit only the pattern, already established, that he was an overbearing and unpleasant supervisor. There is still no reason to find that his actions were motivated by Cabañas's sex or nationality. Likewise, even if we were to accept Cabañas's claim that Giddens sent Welch to discipline her on Giddens's behalf, nothing that transpired during that meeting (or at any other time) suggests that either Giddens or Welch were meting out such discipline on account of her gender or race. The same goes for the EEO Officers. Nothing in the record even suggests that their angry outbursts or inaction were motivated by impermissible discriminatory animus (though, as we discuss below, they may have acted in a relatiatory manner).

Cabañas also offers McGuinness's statement about hot dogs. We agree with her that a reasonable person might find this statement offensive—it's not inconsequential that he offered to buy her something phallic, while smiling in self-

delight—but, as a one-off incident, it simply cannot form the basis for a hostile work environment claim. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (holding that "offhand comments" and "isolated incidents" cannot, as a general matter, "amount to discriminatory changes in the terms and conditions of employment" (internal quotations omitted)).

Taking all of this together, no rational fact finder could conclude that Cabañas was subjected to a hostile work environment because of her sex or race. As such, we must recommend that the motion for summary judgment be granted as to this claim.

## B. Retaliation

Though we conclude that her hostile work environment claim should be dismissed, her retaliation claim is a different story. There exists in the record a significant amount of evidence from which a jury could conclude that Cabañas was retaliated against for complaining about discrimination.

To make out a *prima facie* case of retaliation, Cabañas must show: (1) that she engaged in protected activity; (2) that she "suffered a materially adverse action, which caused [her] harm, either inside or outside the workplace," and which would "dissuade a reasonable worker from making or supporting a

charge of discrimination"; and (3) that the adverse action "was causally linked to [her] protected activity." *Mariani-Colon v. Dep't of Homeland Security ex rel. Chertoff*, 511 F.3d 216, 224 (1st Cir. 2007).

There is no doubt—and the Government does not dispute—that Cabañas engaged in protected activity. Beginning in 2007, she complained to the IG, and then to various EEO Officers, before finally filing this lawsuit. As for materially adverse actions, there is the matter of her non-promotion, the revocation of her travel agreement, and, of course, the conduct of the IG and EEO Officers. The question is whether there is evidence in the record to suggest that these actions were causally linked to her engaging in protected activity.

We will focus primarily on the IG and EEO Officers' conduct, as it alone shows that her retaliation claim should go forward. Cabañas first went to the IG in 2007. When nothing came of that complaint, she went successively to several EEO Officers, who, on the whole, acted in a way that can be reasonably seen as attempting to stymie her claim. For instance, one told Cabañas—incorrectly, she says—that she simply couldn't file an EEO complaint while her IG complaint was pending. Another screamed at her when she wanted legal advice before

signing the complaint papers, telling her—once again, incorrectly—that she couldn't involve a lawyer until after she filed the complaint. In a misdirected attempt to blunt the force of these actions, the Government offers as an uncontested fact Cabañas's "admission" that the EEO Officers acted as they did in order to minimize complaints and make themselves look good, and because they were tired of her filing complaints. It is beyond us why the Government thinks that this "admission" helps it. To the contrary, it suggests quite forcefully that the EEO Officers acted as they did *because* she had undertaken protected conduct. Taking the admission at face value, it means the Officers wanted to short-circuit her claim, to make it disappear. They wanted to do so because complaints being filed made them look bad, and because they were tired of her. This is retaliation, precisely.[14]

And the treatment constituted a materially adverse action, as it was the type that would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Lockridge v. Univ. of Me. Sys.*, 597 F.3d 464, 472 (1st Cir. 2010).

---

**14.** And there would be sufficient evidence of retaliatory intent even without the "admission," as there would be evidence that her claim was ignored and met angry opposition and false information.

Indeed, according to Cabañas's "admission," this was exactly the purpose of the Officers' actions: they wanted to keep her from complaining, because they were tired of her and to make themselves look good. The evidence in the record would permit a jury to infer that the Army's EEO Officers—to whom Cabañas was required to submit her claim, *see* 29 C.F.R. § 1614 (creating the administrative procedure for federal employees' discrimination claims)—created roadblocks intended to keep that claim out. This is a particularly dangerous sort of retaliation, as it emanates from the office whose job it is to protect the complainant. In this sense, even though the Officers' conduct had no bearing on, *e.g.*, her salary or disciplinary record, their actions were of the sort perhaps most likely to dissuade an employee from engaging in protected conduct. As such, we find that her retaliation claim must survive,[15] and that the

---

15. Some courts have held that a failure to internally investigate an employee's claims is not a materially adverse action, because it would not "constitute[] a materially adverse change in the terms or conditions of . . . employment." *Daniels v. United Parcel Serv., Inc.*, 797 F. Supp. 2d 1163, 1195 (D. Kan. 2011); *see also Fincher v. Depository Trust & Cleaning Corp.*, 604 F.3d 712, 721 (2nd Cir. 2010) ("[A]n employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint."). We are not entirely convinced by these cases' reasoning, but even if they constituted the law in this

motion for summary judgment should be denied as to this claim.[16]

### IV.    Conclusion

_____

Circuit, we would find them distinguishable. Unlike the case with the employee of a normal business, Cabañas was required to exhaust her claim by filing it with the Army's internal EEO Office. In such a case, the harm that she would suffer from being denied that opportunity is much more significant, as it is a prerequisite to her filing a lawsuit. *See* 29 C.F.R. § 1614.106(a) (requiring federal employees to complain to the agency's EEO office before filing a lawsuit). Moreover, the actions of the EEO Officers here are more than a mere failure to investigate—a jury could interpret there actions as erecting—or attempting to erect—a bar to filing a complaint at all.

**16.** As for the cancellation of the transportation agreement, the Government offers a legitimate reason: that it had been improperly granted in the first place. Cabañas responds that she was in fact entitled to the agreement, but even if she weren't, given the context of the EEO Officers' pushback, and given that Cabañas had been able to renew her ID several times after 1999 without incident, the close temporal proximity between the revocation and her filing this lawsuit—barely a month—is somewhat suspicious, and it could permit a jury to find that the decision was pretextual. We note that at the summary judgment stage, neither party has attempted to show that the decisionmaker responsible for the termination of her transportation agreement did or did not know of Cabañas's discrimination complaints, and as such we believe the issue of knowledge is open. At trial, however, that question would be important to a determination of whether the cancellation of the transportation agreement was retaliatory. *See, e.g., Canales v. Potter*, 614 F. Supp. 2d 213, 220 (D.P.R. 2009) (noting that "there must be proof that the decisionmaker knew of [the plaintiff's] protected activity").

For all the reasons state above, we RECOMMEND that the Government's second motion for summary judgment, Docket No. 69, be GRANTED IN PART AND DENIED IN PART, and that Plaintiff's hostile work environment claim be DISMISSED WITH PREJUDICE.

IT IS SO RECOMMENDED.

The parties have fourteen days to file any objections to this report and recommendation. Failure to file the same within the specified time waives the right to appeal this report and recommendation. *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150-51 (1st Cir. 1994); *United States v. Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986). No extensions of time will be allowed.

In San Juan, Puerto Rico, this 26th day of February, 2014

S/ SILVIA CARREÑO-COLL

UNITED STATES MAGISTRATE JUDGE